Good morning, and may it please the Court, my name is Sean Malone, here on behalf of the Conservation Congress. I'd like to reserve a few minutes for rebuttal, please. I'd like to start with the National Forest Management Act claim as related to the large stack standard. That's the first claim in our brief. Now, I'm looking to verify any sort of forest plan standard. We look for the evidence. Most likely, it's going to be in the environmental analysis, the decision notice, or the finding of no specific impact. Fonzie, can you fill in that? I just want to feel the studies shortly before they made the determination that environmental assessment was sufficient. That's very much an issue. You're right, it's the October 2nd. Can you deny that the studies occur? I think the primary issue here is where is the evidence that substantiates the conclusions that were made from this October 2011 unit assessment. All we have in the entire record, and we've been over it, and we haven't been cited to anything other than a statement that this occurs. This was at experts record 785, and it's in the report, and it's not specifically part of the environmental assessment, but it says proposed treatment units have at least two snacks per acre greater than 15 inches of DPH, that's diameter of breast height. There's a footnote there, and it says based on unit assessment in October 2011. If we can't get to this sort of underlying information that would have been collected, or the field knows, or some sort of underlying information or evidence about the 2011 October unit assessment, then the public is unable to. So is your complaint a discovery? That you're not denying that there was a study, and that was the conclusion of it, but you're saying I want to see the field notes of the people who actually went out and looked at the ticker stand. Is that what you're finding? To what extent, for the public to challenge any of the conclusions of an agency that evidentiary information has to be available to it, did you ask for, did you write a letter to them and say, please say you want to see the field notes, and what other documents exist? Well, the administrative record here is prepared by the Forest Service. At the beginning of the letter, whoever asked you to see this study is all around you. So things are put in the administrative record, and if the Forest Service felt that they should be in the record, which they should be, because that's something that's being considered by the decision maker, this unit assessment, if that is not in the record, it basically said we did a field study, and then they lay out what the field study showed in terms of, say, you're saying they need to do more of that. In terms of large sags, this is the only statement. So there's sags, and there's large sags. The large sags are important. Historically, the Brookbine project area has been long and heavily focused usually exclusively on large old trees, and that creates a, I mean, it's the problem with your argument. I thought I understood from the briefing that the original creation of the forest plan said, and we recognize that because of historical logging and wildfires and so on, that there's a shortage of sags. But then in 2011, they actually send foresters out to look at the particular standard of timber that's proposed for these treatment operations, and they do an actual estimate of the sags, and they find that in this particular area, it does meet the sags standards. To me, that does show that the Forest Service took the records in hard luck and actually went out on the ground and looked to see how many sags they had. So there's no connection there. That's arbitrary and depreciation, because you would like to have actually seen the field books that led to that report to find a standard. If anything, we're looking forward to some information, some evidence to substantiate that that occurred. The Ombong-Glantz-House-Mimic-Mirror case from the circuit, Judge Willotsmith, stated that the Forest Service must explain the reasons it considers the underlying evidence and really emphasize that the underlying evidence has to be reliable. It isn't an underlying evidence that the decision-maker is relying upon, including that we've got a sufficient number of sags to support this case. As I see it, it's only a conclusion that seems to occur. There's no underlying evidence to support it. Or is it some study that was commissioned just for the paper? If there's a study, and I would like to see the study, only in the use of a laboratory experiment with beakers and chemicals, that we send a forester out and we count the number of sags, or we figure out when we're going to cut trees, which ones we're going to leave standing. Isn't that what we're talking about here? Or have I missed a spreader? I don't assume that the foresters who went out did this did not count, and they're in it. They had some methodology, and that methodology would normally be to deference by this court. I don't think it's possible even there. But Judge Mullins-Smith, the author of that opinion, noted that there are limitations on this. This is not rocket science. I mean, all we have to do is go out into the forest and look to see what's there. And some of the trees are dead, and some of them are live, healthy trees, and some of them are too close to other trees. But part of the assessment is to try and figure out what have we got on the ground here, and isn't that what one of these studies does? And I thought I understood earlier. Maybe you can give us some sense to know how these studies are typically conducted. What is it that you have done? Underline that, or what is it that you've done? We're doing a lot of these things on administrative records associated with these things. We'll have field notes. They don't just go out there and drop things in their head. They have paper. They're writing down things. They're saying, I'm in Unit 42. Here's two types. I'm seeing two or three snags that have particular criteria that are a certain height, that are a certain DDH. And those are the types of things that we typically see in these administrative records, and those are the types of things that that actually occurred. Don't leave this deployed. I guess my point about it is it's a trickle, but there's problems. If you had the underlying data, what is it that you would do? That you would be in a position to say, well, actually, it's not to teach that. We could review it and determine whether that standard enforced plan is actually satisfied. In these circumstances, my client community, all of my client communities accept the conclusions that they're saying about that field assessment. If there was any information in the record to address or hold up an assessment for the conclusory sentence in a footnote, then, well, you sign it as an executive record 785, and I'm looking at the paragraph, the first full paragraph at the top of the page that reads, there are currently 3,913 acres of snag and down log assemblage habitat within the stands proposed for treatment with trees and snags greater than or equal to 11 inches dbh. Proposed treatment units have at least two snags per acre greater than 15 inches dbh, citing to the study. There are likely more snags, however, as stands proposed for treatment are currently overstocked at levels that exceed climate, at which an increase in the chance of disease and insect infestation occurs, and therefore, snag recruitment is expected to have continued over the past 2 1⁄2 years, and then it goes on to even more detail about coarse woody debris and so on. And your position is that the Forest Service didn't take a look at the snag numbers to see if it would meet the forest plan? That phrase is based on that assessment. The first sentence that you read, Your Honor, is 2,311 inches dbh, and it's not, that's the good news here that we were specifically talking about. Well, then the second sentence deals with more than two snags per acre greater than 15 inches. The second sentence doesn't provide a conclusion. That's the concern here. But then it goes on to say we expect that there are even going to be more than that. It's not referencing large snags. It's not referencing snags that are greater than 15 inches dbh. Well, it also didn't reference that statement. It cites to a 2008 porcupine vegetation and road management project as of a cultural report updated by Greg Sewell, May of 2014, unpublished report on file at U.S. DHS to China Data and Cloud. That would be its record, but that's not, there's nothing in that report that states that. The problem I'm having with the argument is usually when we have this kind of an objection, the agency didn't consider it at all. And that's an easy case for us. But here, there is evidence that the agency took the requisite hard look. And as I understand it, you're really arguing about I want more detail than what they gave me in the decision, not that they didn't look at it. How is it at a piece of discretion for the district court to deny an injunction on this record? It's a unit. So, that's not 2005 you're talking about. That's from 2008. The one above it is talking about 2011. And it was updated by Greg Sewell in May of 2014 as pre-current information. Sorry. The basic point we've been trying to get across here is that if the record does not contain the underlying evidence, which was emphasized in last council meeting there, then the agency is not providing the public enough information to challenge the agency's conclusions. And as far as this October 2011 unit assessment goes, that's the only thing in the record substantiating that there was an October 2011 unit assessment. And I can only think of three things that the agency put in the record, that the enforcers didn't take any notation about that assessment, which is problematic because it's not fulfilling these purposes you need, but it provides information to the public that allows us to challenge these conclusions. Or the third thing is that it didn't have, under any three of those things, the agency's... Well, it's hard for me to conclude based on this record, because to your last point, that there was clear error in the district court finding that the enforcers never considered To me, this record is sufficient to show that it was, in fact, considered. Because your argument is it wasn't sufficiently shown as to how it consisted. It's important to individuals. Like my clients, we're trying to corroborate. So CSC wasn't considered. But I understand your... Do you want to take some time? It looks like we've got about three minutes left. We're going to take one minute here to touch upon the EIS, the first EIS. That's a very important issue. That's an uncertainty issue. Here, the agencies are going to have these different conclusions about the effect of fire on the northern spot, about the effects of Record 164, the Forest Service States and the recovery plan, and see if additional research is needed to further understand the relationship between fire and the spot, and also how the Fish and Wildlife Service Inter-Recovery Plan, Excerpts of Record 832, concedes there's limited data. It concedes that there's multiple compounding factors or uncertainties in the data on this topic. There's many unknowns regarding how much fire benefits are at risk of the northern spot now. And this project is moving forward in an effort to lessen or reduce the likelihood of wildfire, which many studies say will indicate benefit for northern spot owls. And adding to that is the logs not very dense, not too severe, so that we're going to put a little bit of testimony to move forward. High-severity fire, they have been found in record sales. This is according to our brief. The bonds, including the OND, they indicate that they react positively to high-severity forest fires. Mr. Nitzelsberg, so are you asking us to be scientists here, and sort of pick sides on which scientific assessment is not at all your honor? I'm just asking the board to acknowledge that there's this significant uncertainty going on with regard to this, and that the whole quantum EIS is what we're requesting. It's not being looked at by the health government at all as uncertainty as a result. That's part of what? Preparation for the environmental impact statement, a much more robust document. Your argument is broader than that. This is a big question. Is it not? Yes. On forest management and its wildfire management. Whether or not the policies of the last several decades of actually suppressing fires has caused more problems than has solved what we should have just done. More specifically, related to the non-spotted owl, but to an extent, yes. I'm going to pass on that. Good morning. My name is Erica Kranz. I'm representing the Forest Service. The treatments issued here were various alleged to be treated are areas that are, by definition, overstormed. They are already seeing the effects of basically spread disease and insects. They have fuel overloading that can, as you mentioned, cause uncharacteristically severe fire. These conditions both put the forest at risk of increased mortality, but it also inhibits growth and the development of a kind of late successional forest that we know the non-spotted owl prefers. This project was signed with targeted agreements to address these problems. In lieu of the one thing that's threatening me the most, I vote against it. I guess I take your opponent's argument to, at least on that first issue that you raised, to be a relatively terrible one. They're just complaining that all we have is a fair conclusion from the Forest Service. We want to know exactly what those numbers actually say. Don't you have to provide the undermining data? I really wish the Forest Service would provide some of that in the public as a basis for Well, what the case law says the agency has to do is it has to do an adequate study to satisfy itself. That's what Lands Council tells us. Now, the claims that you have from the Northern Plains, this idea that you have to provide all this underlying data, what those cases are actually about is a complete failure to establish a baseline for it all. Now, they're not actually complaining that this study didn't happen. They, of course, would just like to see more evidence. But what this court said in Lands Council is, agency, we're not going to tell you how to do your job. You just need to do a reasonable job. And it's been the plaintiffs who started to show what the agency did was not the case. I have a question. I'm from the relevant language in Lands Council. And it says that the Forest Service has to undertake studies that the agency in its expertise deems reliable. And I don't think anyone's disputing that. There are quite a few studies here. I'm looking at the bibliography and the reference at the top because they're slow to report. Do you have to provide the underlying studies as well? Well, again, the kind of study that's at issue here, this 2011 assessment, was indeed a wildlife biologist going to the treatment areas, looking around and verifying that there were adequate adverse effects. Well, okay, how big is the treatment area? The treatment area is scattered units amounting to about 4,000 acres. So you're saying that the individual person co-operates with those entire 4,000 acres in a little piece of paper that's a few years long? Yes. Okay. So you're saying there's a methodology that's used, and don't you have to disclose at least what the methodology is? I think that there's really – this isn't really a close call here. My understanding is that there were not just two stacks per acre, but plenty of stacks per acre, which was not unexpected. But you're right. I'm not trying to say that the Forest Service is engaged in some absence fraud here. But you do have a legal principle that the planners are seeking to educate. I guess I'm just having a hard time understanding how you consist of requests to disclose. If you're not going to give the studies, at least explain what the methodology was. That, again, is what William C. also said as the Forest Service. Let's explain your conclusion as it is drawn from its chosen methodology. Well, don't you at least have to say what the methodology was for assessing whether or not it increases reliable coverage? Right. And, I mean, what we have in the record here, the explanation of the methodology, was it was easy to do the size of our unit assessment. So it wasn't a person walking through on the ground. They don't know that she could see. Just say they're every single stack in 4,000 acres. That's not what happened. You know that's not what happened. So there was some other methodology that was used, like you said, to extrapolate from a more limited set of data. And you just say that the public has to take your word for it that it was done right. Correct. I don't think that's what our cases allow. I think what your case suggests is that you apply rule of reason to this situation. So, certainly, the best case scenario would be if we had the field notes in the record or not in that situation. The question is, is it reasonable? Is the conclusion that the agency drew reasonable in this situation? Well, here are a couple of thoughts. One is we know that these treatment areas were chosen because they're overstocked. They've been experiencing higher than average mortality, which is another way of putting it. They've been recruiting stacks. So there have been more and more stacks over time developing in these areas. You know, that's one of the reasons that holds it. That's one of the ways we can understand why the very general statement in the 2003 watershed analysis doesn't apply to these particular units that are being treated. You know, another thing that's really important to keep in mind here is that this project is not going to cut down any snags, except in very limited situations. The Forest Service reported that there's going to be a negligible loss of snags. That's in ER 787. And once treated, these areas are still going to recruit snags. And, in fact, they're going to recruit larger, i.e. better, snags. That's at ER 121. They've reported that these treatment areas will continue to recruit snags at about one to three per decade in ER 330. So, I mean, although, again, we're not in the perfect universe here, I believe there's plenty here to support the Forest Service's conclusion that it satisfied itself that these snag standards are going to be met. But let me ask you just about the reference to the Tuscarora Zoo in 2014. So there's a reference to an unpublished report on file, right? This is that ER 281. Yeah, ER 281. That, I think, is the source that the Forest Service cites for its conclusion that the snag standard will be met. And so there's a reference to an unpublished report. So there's a physical document that makes sense here that the Forest Service is relying upon to support its conclusion. So that wasn't a part of the administrative record here? It is not one of them? I think what the plants are specifically complaining about is the 2011 unit assessment as opposed to the 2008 published report. I don't know. I'm just looking at it. I guess I thought this was the source that the Forest Service itself cited to support its conclusion that the snag standard will be met. So let me go to that. So we look at, oh, it said that there's a reference to an unpublished report on file with an apartment with agriculture. Right. So there's a physical document that the Forest Service is relying upon. I'm just asking if that wasn't a part of the administrative record. I don't believe that that is part of the administrative record. Okay. And why aren't the plants at least entitled to insist upon its disclosure so that they can again have some basis for assessing a reasonable incident? Again, I could be wrong. I don't believe the plants are specifically complaining about the 2008 unpublished report. Instead, they are complaining about the lack of yield notes for this 2011 assessment, which is primarily what the Forest Service is relying on here. The wildlife biologist who did that field assessment is the same person who authored the Management and Educator Assemblies report, which is where a lot of these events were found. So it's not as though there was some, you know, game of telephone where the person who did the assessment told someone else or told someone else. It's the same person who did, you know, went out into the field and then wrote down her very general conclusion about how birds can see owls. I'd like to move to the uncertainty point, if I may. You know, the fact that the Forest Service has acknowledged that there's some uncertainty about the role that fire play is for owls doesn't make this project highly uncertain. We know that northern spotted owls do not like standard placing fire, and that's the type of fire that this project is in part designed to help prevent. We're not at all trying to eliminate fire, and not even the number of fires. It's the intensity of fire that the Forest Service is trying to affect here. It's trying to move, you know, the chance of fire from being a moderate to high severity down to a low to moderate severity. That's the type of fire that helps the forest develop, that these large trees that are really good habitat can survive and thrive in. So, again, we're not, you know, to the extent the owl likes fire, it's not this super high severity fire. And, also, low severity fire is still going to occur at a more natural interval. Sure. That's right. So the drought has exacerbated all of this. We have a really bad combination of, you know, we just need fuel to build up and then drought. The revised recovery plan for the northern spotted owl reports that loss from fire is one of three major threats to the northern spotted owl. We know that northern spotted owls like these places with small habitat. That's what this project is, in part, about developing. And the Fish and Wildlife Service, which is an expert agency, of course, charged with assessing effects on threatened and endangered species, said that this project is going to have an insignificant effect on owl habitat. And it will be beneficial to the owl over time. That's in ER 391. The plaintiff has brought up this bond study. The Forest Service addressed that study. There are a couple of cases, including in response to comments from the plaintiff, that's in SBIR 12 and 13, and in the EA at 164. And, finally, to the extent there is uncertainty, the revised recovery plan for the northern spotted owl makes really clear that we can't wait to resolve every speck of uncertainty. It urges action. It urges just the kind of adaptive management, active management of dry forests like this. You can find that at SBIR 67 and 70, and then Exarch's record, EA 38. So, to the extent we have some uncertainty, and that uncertainty does not put us in EIS territory. It's relatively minor. And it's more about how what would happen with the owl in the no-action alternative, where we're continuing to be at risk of standard-facing fire, than it is about the effects of this project, which is going to return us to a more normal natural fire interval. I want to hint at a couple other things. One, a cumulative effects analysis. The plaintiff has insisted a number of times that the Forest Service has just ignored its request to use a larger metric for assessing cumulative effects. The Forest Service has not ignored this and addressed the plaintiff's complaints. You can see that in SCR 17. The plaintiff also insists the Fish and Wildlife Service says that the Forest Service has to use this much wider metric. That's also incorrect. If you look at Exarch's record 389, that's the Fish and Wildlife Service talking about the 1.3-mile metric that it uses for cumulative effects. And, yes, that is cumulative effects if you look at 50 CFR 402.02. And so, finally, if there aren't any more questions, we would urge you to affirm the District Court's decision on holding this project. It's a good project for the forest and for the owl. It's been very carefully designed to address the serious effects to this forest. Councilor, are we reviewing a decision on the merits or a decision not to enjoy the project? It's a decision on the merits at this point. Yes. With regard to your last question, there's some de novo review here. So, in terms of your review, it's clear. The courts defer to a methodology. With all the methodology provided, we cite to a case organized by the District Association that says, in the context of talking about methodology, courts cannot defer to a point. And that's really what we're looking at here. If the evidentiary support for this 2011 unit assessment was in the record, we wouldn't have brought this claim because there likely would have been a methodology inherent in there. I'm right. You know that a month before a service says that it's not in the record, should you remember that there's a motion to note that's in the air, published reports are on file, that you can go in and make a public record request? Yes. Anything that the decision-maker considered in his decision, in his or her decision, is supposed to be in the administrative record here in question. I keep asking, what do you ever ask to see? But do you know what it is? It's typically not how it occurs. Yeah, I don't know how it occurs. Is there a right question? We have not a simple yes or no question. Okay. Unless my client says, oh, correct. Thank you. It's okay. Your time is up. Case is organized.
judges: Tallman, Watford, Guirola